**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JULIE SAWYER,

      Plaintiff,

         v.

FIREMAN'S FUND INSURANCE
COMPANY, and AMERICAN AUTO
INSURANCE COMPANY,

      Defendants.

CIVIL ACTION NO. 3:03-CV-0233

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are Defendants' Motion for Summary Judgment (Doc. 79) and Plaintiff's Motion for Summary Judgment (Doc. 85). Following oral argument on the motions and for the reasons set forth below, Defendants' motion will be granted in part and denied in part, and Plaintiff's motion will be denied. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332.

## FACTUAL BACKGROUND

On January 5, 1999, Julie Sawyer was in a motor vehicle accident involving herself and another driver, the alleged tortfeasor Ryan Brunner. (Doc. 79, Ex. B; Doc. 87, Ex. A.) Plaintiff, in the course and scope of her employment, was operating a school bus owned by Pocono Mountain School District ("Pocono Mountain") at the time of the accident. *Id.* The school bus was insured by American Automobile Insurance Company ("American"), policy number MXG80765679, issued to Pocono Mountain. (Doc. 79, Ex. J; Doc. 87, Ex. B.) American, at the relevant time, was a wholly owned subsidiary of

1

Fireman's Fund Insurance Company ("Fireman's").  (Doc. 79, Ex. E.)

### a.    Pocono Mountain's Insurance Policy

Defendants have submitted evidence that the insurance policy in effect on the date of the accident, policy number MXG80765679, which had the effective dates of coverage of July 1, 1998 to July 1, 1999, was a renewal policy.  (Doc. 81 ¶ 9; Doc. 79, Ex. H, Ex. I, Ex. J.)  Pocono Mountain's previous insurance policy with American, policy number MXG80677681, had the effective dates of coverage of July 1, 1997 to July 1, 1998.  (Doc. 79, Ex. D.)  Defendants further submitted evidence that Paul Kelly, the Secretary/Business Manager for Pocono Mountain in charge of purchasing insurance for the district, executed a rejection of stacking of uninsured motorist ("UM") coverage and underinsured motorist ("UIM") coverage for policy number MXG80677681 on or about November 17, 1997.  (Doc. 79, Ex. G.)  Moreover, Defendants submitted evidence that on or about November 17, 1997, Paul Kelly also executed a write-down form for policy number MXG80677681; reducing UIM coverage under the policy from one million ($1,000,000) to thirty-five thousand dollars ($35,000).  (Doc. 79, Ex. C at 5-10, Ex. D, Ex. F.)  Plaintiff, for reasons to be discussed, contests the validity of the applicable write-down form and waiver of stacking form.

### b.    Investigation of Plaintiff's Claim

Shortly after the accident, on January 12, 1999, Plaintiff had a recorded statement taken at the request of Defendants in which she indicated that she was not injured in the accident.  (Doc. 79, Ex. L.)  Plaintiff then later discovered that she had suffered personal injuries to her shoulder and spine, and on October 30, 2000, Plaintiff's counsel wrote to

Defendants informing them of a potential UIM claim involving Mr. Brunner and requesting payment of UIM benefits.  (Doc. 79, Ex. M; Doc. 87, Ex. A at ¶ 5, ¶ 9.)  Defendants submitted evidence that on November 3, 2000, Patrick Muth of Fireman's ordered the file from the archives.  (Doc. 79, Ex. N-1.)  On November 10, 2000, according to evidence submitted by the Defendants, the matter was assigned to an adjuster by the name of Charles Butka who noted that: (1) the tortfeasor's carrier was contesting the causal connection between the accident and Plaintiff's alleged injuries; (2) Plaintiff's counsel had not provided information about a workers' compensation lien; (3) the tortfeasor had a one hundred thousand dollar ($100,000) policy; and (4) the adjuster for the tortfeasor's carrier indicated that they felt the case was within their layer of liability coverage.  (Doc. 79, Ex. N-2, Ex. N-3.)  According to Plaintiff, Mr. Butka also wrote Plaintiff's counsel on November 10, 2000, stating that the UIM benefits available under the policy were thirty-five thousand dollars ($35,000).  (Doc. 87 ¶ 11.)

Defendants, next, submitted evidence that Plaintiff's counsel waited almost a year before he again contacted the Defendants on October 5, 2001.  (Doc. 79, Ex. O.)  During this time, according to evidence submitted by Defendants, Mr. Butka called either Plaintiff's counsel or the adjuster for the tortfeasor's carrier on several occasions requesting the status of Plaintiff's third party claim.  (Doc. 79, Ex. N-3 through Ex. N-8.)  In his October 5, 2001 correspondence, Plaintiff's counsel: (1) advised Defendants that he had received a settlement offer of ninety thousand dollars ($90,000.00) from the tortfeasor's carrier; (2) requested Defendants' written consent to settle for that amount; (3) requested that Defendants provide a certified copy of the applicable endorsements for the UIM provisions of the insurance policy; and (4) requested a copy of the applicable

3

write-down form and waiver of stacking form.  (Doc. 87 ¶ 11; Doc. 79, Ex. O.)

After receipt of the October 5, 2001 letter, the file was transferred and assigned to adjuster Melissa Mulkeen on November 7, 2001.  (Doc. 79, Ex. N-9; Doc. 92, at 23.)  On November 7, 2001, according to evidence submitted by Defendants, Ms. Mulkeen noted that Plaintiff had still not provided any medical records, bills or notes confirming Plaintiff's alleged injuries, and that Plaintiff had not forwarded authorizations to allow Defendants to obtain such records on their own.  (Doc. 79, Ex. N-10.)  Plaintiff submitted evidence that Defendants, for the first time, requested copies of Plaintiff's medical records by correspondence from Ms. Mulkeen, on November 12, 2001.  (Doc. 92, at 61.)  Plaintiff further notes that Ms. Mulkeen's correspondence on November 12, 2001, did not provide the requested write-down form or consent to settle.  *Id.*

On November 19, 2001, Plaintiff's counsel sent a letter to Ms. Mulkeen requesting: (1) a check in the amount of ninety thousand dollars ($90,000.00); (2) demanding UIM arbitration; (3) appointing an arbitrator; and (4) requesting the applicable write-down form and waiver of stacking form.  (Doc. 79, Ex. Q; Doc. 87, Ex. A at ¶ 12.)  On November 20, 2001, according to evidence submitted by Defendants, Plaintiff's counsel forwarded copies of Plaintiff's medical records for the first time.  (Doc. 79, Ex. R.)

On November 26, 2001, the file was assigned to Joanne Garland.  (Doc. 79, Ex. N-11.)  On November 28, 2001, Ms. Garland referred the case to defense counsel James Wilson.  (Doc. 79, Ex. N-12.)  Plaintiff has submitted evidence that, also on November 28, 2001, Ms. Garland's log for the day stated,". . . However, for today, I need to fax them some of the papers so they can contact PLTF ATTY to put the 'brakes' on the arbitration. . . ."  (Doc. 87 ¶ 32; Doc. 92, Ex. "Mulkeen 2".)

4

Next, on December 12, 2001, according to evidence submitted by Defendants, Mr. Wilson wrote to Plaintiff's counsel indicating that: (1) he had requested all applicable insurance documents from Defendants; (2) he would appoint a defense arbitrator soon; and (3) Defendants likely did not yet agree to the ninety thousand dollar ($90,000) settlement because they did not have any medical documentation.  (Doc. 79, Ex. S.)  On December 17, 2001, Plaintiff's counsel wrote to Mr. Wilson providing a copy of his November 20, 2001, letter to Ms. Mulkeen enclosing his client's medical records.  (Doc. 79, Ex. T; Doc. 87, Ex. A at ¶ 14.)  Plaintiff's counsel also renewed his request for the applicable insurance documents and permission to settle the third party claim.  *Id.*  No one requested a copy of the applicable write-down form from Defendants' archives until December 31, 2001, when a request was made by Mr. Wilson.  (Doc. 89, deposition of Joanne Garland, at 28-30.)

Then, on January 7, 2002, Defendants' counsel wrote to Plaintiff's counsel appointing Lori Cerato as Defendants defense arbitrator.  (Doc. 79, Ex. U.)  Further, on January 8, 2002, Defendants' counsel wrote to Plaintiff's counsel giving authority to settle with the tortfeasor for ninety thousand dollars ($90,000.00).  (Doc. 79, Ex. V.)  On January 10, 2002, Plaintiff's counsel again wrote Defendants' counsel requesting the signed UIM write-down forms and/or waiver of stacking forms.  (Doc. 79, Ex. W; Doc. 87, Ex. A at ¶ 15.)  On January 11, 2002, according to evidence submitted by the Defendants, Defendants' counsel wrote to Plaintiff's counsel indicating that he was still awaiting the waiver of stacking forms and signed UIM write-down forms.  (Doc. 79, Ex. X.)

On March 11, 2002, Defendants' counsel extended an offer of thirty-five thousand dollars ($35,000) to Plaintiff to settle the UIM case.  (Doc. 79, Ex. Y.)  The offer has not

5

been accepted.  On March 12, 2004, the testimony of Stephen Florian, the designated witness for Fireman's was taken by way of oral deposition.  (Doc. 88.)  Mr. Florian testified that "[t]o retrieve a file from archives it would be days, within a couple of days." (Doc. 88 at 67.)

On April 18, 2002, according to evidence submitted by Plaintiff, Plaintiff's counsel wrote Defendants' counsel requesting that Defendants stipulate that there was one million dollars ($1,000,000) in UIM coverage available.  (Doc. 87, Ex. A at ¶ 16.)  On May 14, 2002, Plaintiff's counsel again wrote Defendants' counsel to request that Defendants stipulate that there was no signed write-down form or waiver of stacking form.  (Doc. 87 ¶ 23.)  On June 5, 2002, Plaintiff's counsel again requested the applicable write-down form and/or waiver of stacking form, according to evidence submitted by the Plaintiff.  (Doc. 87, Ex. A at ¶ 19.)

On June 28, 2002, according to evidence submitted by the Plaintiff, at the time Plaintiff's deposition was taken and for the record in the UIM arbitration proceeding, Defendants' counsel stipulated that there was no write-down form.  (Doc. 89 at 63-64; Doc. 90, deposition of James Wilson, at 37-40; Doc. 90, deposition of Julie Sawyer, at 4-5.)  Then, on July 10, 2002, according to evidence submitted by the Defendants, immediately after receiving the applicable write-down form from Pocono Mountain School District's broker, Willis Corroon Corporation of Pennsylvania ("Willis Corroon"), Defendants' counsel forwarded a copy of the form to Plaintiff's counsel.  (Doc. 79, Ex. Z, Ex. F.)  Defendants have not produced the original write-down form or original insurance application.  Defendants submitted evidence that the original documents are missing. (Doc. 88 at 68-67, 82-83.)

6

On July 29, 2002, according to evidence submitted by the Plaintiff, Defendants' counsel wrote the neutral arbitrator requesting a continuance stating that it was his belief that disputes as to stacking of policies or the limits were required to be submitted to the Court under the applicable provisions of the policy.  (Doc. 87, Ex. A at ¶ 21.)  Plaintiff also submitted evidence that Defendants repeatedly indicated to Plaintiff that they were intending on filing the Declaratory Judgement Action, however, as of the time of the filing of Plaintiff's Complaint, the Defendants had failed to do so.  (Doc. 87, Ex. A at ¶ 22.)

## PROCEDURAL BACKGROUND

On or about January 6, 2003, Plaintiff filed a complaint against Defendant Fireman's in the Court of Common Pleas of Lackawanna County, Pennsylvania, seeking declaratory relief and alleging breach of insurance contract and bad faith.  (Doc. 79, Ex. A.)  Then on or about February 21, 2003, following a clarification of the proper defendants, Plaintiff filed another complaint in the Court of Common Pleas of Lackawanna County, Pennsylvania.  This second complaint added American as a defendant, as well as a claim for civil conspiracy.  (Doc. 79, Ex. B; Doc. 87, Ex. A.)  Both actions were removed to this Court upon the request of Defendants.  (Docs. 1, 2.)  On June 4, 2003, the Court entered an Order consolidating both actions under docket number 3:03-CV-0233.  (Doc. 6.)

On November 21, 2005, Defendants filed a Motion for Summary Judgment.  (Doc. 79.)  Defendants then filed a Brief in Support (Doc. 80), accompanying Exhibits (Docs. 88-92) and a Statement of Facts (Doc. 81).  Plaintiff did not file a Brief in Opposition, but did file a Motion for Summary Judgment (Doc. 85).  In addition, Plaintiff filed a Brief in Support (Doc. 86) and a Statement of Facts (Doc. 87).  Defendants then filed a

7

Statement of Facts (Doc. 94) in opposition to Plaintiff's statement, as well as a Brief in Opposition (Doc. 95).  On January 3, 2006, Oral Argument was held before the Court on these Cross Summary Judgment Motions.  (Doc. 96.)  Both motions are adequately briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *See id.* at 248.   An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient

8

showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *See Anderson*, 477 U.S. at 256-257.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## DISCUSSION

Plaintiff's summary judgment motion requires the Court to address two major issues. First, Plaintiff seeks judgment in her favor as to the bad faith claim brought against Defendants. Second, Plaintiff seeks a determination from the Court that the policy limits for UIM benefits, for policy number MXG80765679, are one million dollars ($1,000,000). Specifically, Plaintiff argues that: (1) Defendants have stipulated to the non-existence of a write-down form, and (2) the validity of the write-down form later produced by Defendants is in question. Plaintiff contends that without a valid write-down

form, the policy limits are equal to the bodily injury liability limits of one million dollars ($1,000,000), pursuant to 75 PA. CONS. STAT. § 1731(c.1).  Defendants' summary judgment motion asks the Court to determine, conversely, that the policy limits for UIM benefits, for policy number MXG80765679, are thirty-five thousand dollars ($35,000). Further, Defendants seek summary judgment as to Plaintiff's bad faith claim.  Lastly, Defendants seek summary judgment as to Plaintiff's claims for breach of contract and civil conspiracy.  Because resolution of the bad faith claim is tied to the reasonableness of Defendants' actions, the Court will first address some of the other arguments raised in these cross-motions for summary judgment.

## 1.    Stipulation

Plaintiff has submitted evidence that on June 28, 2002, at the time Plaintiff's deposition was taken and for the record in the UIM arbitration proceeding, Defendants' counsel stipulated that there was no write-down form.  (Doc. 89 at 63-64; Doc. 90, deposition of James Wilson, at 37-40; Doc. 90, deposition of Julie Sawyer, at 4-5.)  The relevant portion of the transcript reads as follows:

> MR. WILSON: I can stipulate at this time the following: I can stipulate that I've spoken to the underwriting department. As of yesterday, they've told me that they've searched the file and can not find any write-down.  I can tell you that I've spoken to the agent, Mr. Audinger, of Louis Krum (ph); and they can find no write-down.  I can tell you I've spoken to the business manager of Pocono Mountain School District and they can find none, so as far as I can tell, there is none.  Now, my understanding from the law is that means the limits are one million dollars.
> MR. FOLEY:  Right.
> MR. WILSON: Before I Stipulate that those are the limits, I would like to make sure I'm right on that.  I would like to make sure there is no question at the lack of the

> signed writing requesting lower UIM limits necessary means, as a matter of law, the limits will be the same as the later limits.
>
> MR. FOLEY:  Can we at least Stipulate that there was no write-down for reducing the UIM limits below the liability limits that went into –
>
> MR. WILSON:  I think we can stipulate to that.

(Doc. 90, deposition of Julie Sawyer, at 4-5.)

Defendants have submitted evidence that they did not stipulate that a write-down form did not exist, but rather agreed that a write-down form had not yet been located. (Doc. 95, Ex. ANS-1.)  Further in support of their contention, Defendants emphasize that the alleged stipulation is qualified by Mr. Wilson's statements that "*so as far as I can tell, there is none,*" and that, "I *think* that we can stipulate to that."  (Doc. 59.)  Because I find that the alleged stipulation must be allowed by the Court to be withdrawn in order to avoid manifest injustice, I need not determine the precise contours of the parties agreement.

"Judicial admissions . . . are formal pleadings in the case, or stipulations, oral or written, by a party or his counsel which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.  Thus the judicial admission, unless it should be allowed by the court to be withdrawn, is conclusive in the case . . . ." *Durkin v. Equine Clinics, Inc.*, 546 A.2d 665, 670 (Pa. Super. Ct. 1988) (citation omitted). In general, courts encourage parties to enter into stipulations to promote judicial economy.  *See, e.g., Tex. Instruments Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995).  Allowing parties easily to set aside or modify stipulations would defeat this purpose, wasting judicial resources and undermining future confidence in such agreements.  *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998).  Thus, valid stipulations

entered into freely and fairly should not be lightly set aside.  *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.*, 222 F.3d 123, 129 n.7 (3d Cir. 2000).  However, in spite of the severe limitations placed on withdrawing stipulations, they are not absolute, and courts will free a party from a stipulation to prevent a manifest injustice.  *Waldorf*, 142 F.3d at 616-617.

In determining whether there will be manifest injustice unless a party is relieved from a stipulation, courts have focused on such factors as: (1) the effect of the stipulation on the party seeking to withdraw the stipulation; (2) the effect on the other parties to the litigation; (3) the occurrence of intervening events since the parties agreed to the stipulation; and (4) whether evidence contrary to the stipulation is substantial.  *Id.* at 617-18 (citations omitted).  In the present case, assuming the validity of the write-down form produced by Defendants, the evidence contrary to the alleged stipulation that no write-down form exists is clearly substantial.  Furthermore, this evidence was found and produced after the alleged stipulation.  Given these factors and the importance to both parties of whether a write-down form exists, the alleged stipulation will be set aside to avoid a manifest injustice.  As such, Plaintiff's summary judgment motion will be denied with respect to this claim.  Defendants are not estopped from asserting the existence of a valid write-down form.

## 2.      Policy Limits for UIM Benefits Under Policy Number MXG80765679

On October 1, 1984, Pennsylvania enacted the Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 PA. CONS. STAT. § 1701, *et seq.*  In regard to the required UM/UIM coverage, section 1731 of the MVFRL mandates that all policies issued

or renewed after October 1, 1984, must contain UM/UIM coverage "in amount equal to the bodily injury liability coverage except as provided in [s]ection 1734." 75 PA. CONS. STAT. § 1731(a). Therefore, under the MVFRL, "[a] named insured may request in writing the issuance of coverages under section 1731 in amounts equal to or less than the limits of liability for bodily injury." 75 PA. CONS. STAT. § 1734. Moreover, "once an insured has elected, in writing, to either reject or reduce UM and/or UIM coverage, that decision remains in effect until the insured indicates otherwise in writing pursuant to general contract principles." *Nationwide Mut. Ins. Co. v. Merdjanian*, No. 03-5152, 2005 U.S. Dist. LEXIS 3493, at *18 (E.D. Pa. March 7, 2005); *Smith v. Hartford Ins. Co.*, 849 A.2d 277, 281 (Pa. Super. Ct. 2004).

Where an outright rejection of UM/UIM coverage does not met the technical or written requirements of the MVFRL, section 1731(c.1) allows for the reformation of the policy as a remedy to the insurer's violation of the law. 75 PA. CONS. STAT. § 1731(a)-(c.1). Section 1731(c.1) of the MVFRL states that "if the insurer fails to produce a valid rejection form, uninsured or underinsured coverage, or both, as the case may be, under that policy shall be equal to the bodily injury liability limits." 75 PA. CONS. STAT. § 1731(c.1). Conversely, the Pennsylvania Supreme Court has held that the technical requirements and remedial prescription for violation of those requirements in § 1731(c.1) do not apply to requests to reduce UM/UIM coverage under section 1734. *Lewis v. Erie Ins. Exch.*, 568 Pa. 105, 793 A.2d 143, 155 (Pa. 2002); *Fire & Cas. Co. of Conn. v. Cook*, No. 04-2564, 2005 U.S. App. LEXIS 24164, at *5 (3d Cir. July 14, 2005). No specific written format is prescribed by the MVFRL for electing to reduce the amount of UM/UIM coverage, however, a request for lower coverage limits requires the signature of the

13

insured and an express designation of the amount of coverage requested.  *Nationwide Mut. Ins. Co. v. Merdjanian*, No. 03-5152, 2005 U.S. Dist. LEXIS 3493, at \*12 (E.D. Pa. March 7, 2005) (citing *Lewis v. Erie Ins. Exch.*, 793 A.2d 143, 153 (Pa. 2002).  Distinctly, however, where there has been no section 1734 request at all for lower UM/UIM benefits, rather than technical violations of section 1731(c.1), courts have allowed reformation of the disputed policy as a remedy.  *See Cebula v. Royal & SunAlliance Ins. Co.*, 158 F. Supp. 2d 455, 461 (M.D. Pa. 2001); *Clifford v. Prudential Prop. & Cas. Ins. Co.*, No. 99-1788, 2001 U.S. Dist. LEXIS 13808, at \*30 (M.D. Pa. August 28, 2001).

Defendants move for summary judgment as to a determination that the policy limits for UIM coverage are thirty-five thousand dollars ($35,000).  In support of their motion, Defendants submitted evidence that on or about November 17, 1997, Paul Kelly executed a write-down form for policy number MXG80677681; reducing UIM coverage under the policy from one million ($1,000,000) to thirty-five thousand dollars ($35,000).  (Doc. 79, Ex. C at 5-10, Ex. D, Ex. F.)  Defendants, further, stated at oral argument that Mr. Kelly identified his signature on the relevant write-down form during his deposition.  However, Plaintiff countered at oral argument that although Mr. Kelly stated that he signed the write-down form, Mr. Kelly was confused and unclear.  Presently, the record before the Court fails to establish whether Mr. Kelly identified the write-down form, submitted as Defendants' Exhibit F, as the document he signed.[1]

---

[1] The portion of Mr. Kelly's deposition submitted to the Court reads, in relevant part, as follows:

> Q.    For that period, that is if we go back to 1995, up until you sit here today, do you remember having any discussions or there being any discussions with

Further, Plaintiff has submitted evidence that when viewed as a whole, questions the validity of the write-down form produced by Defendants.  Specifically, Plaintiff has submitted evidence that numerous requests were made for the write-down form prior to its subsequent production.  (Doc. 87 ¶¶ 11, 23; Doc. 87, Ex. A, at ¶¶ 12, 14, 15, 19; Doc. 79, Ex. X).  In addition, Plaintiff submitted evidence that normally "to retrieve a file from archives it would be days, within a couple of days" (Doc. 88, deposition of Stephen Florian, at 67).  In the present case, it took Defendants nearly a year and a half to locate the write-down form and, even now, Defendants are unable to locate the original form. (Doc. 79, Ex. Z, Doc. 88 at 68-67, 82-83.)  Lastly, Plaintiff emphasizes that the write-down form contains Fireman's logo, rather than American's logo.  (*See* Doc. 79, Ex. F.)

Given the evidence before the Court, there is a genuine issue of material fact as to

---

|      |      |
|------|------|
|      | anyone, including Willis, that either of those limits should be changed? |
| A. | Either the one million or 35? |
| Q. | Correct. |
| A. | Well, on the basis of the documents you shared with me earlier, there would have been some discussion. |
| Q. | Okay.  Which documents would they be? |
| A. | The ones that I signed and dated November 17, 1997. |
| Q. | Okay.  You signed those documents at that time frame, but did that change the coverage limits?  I mean, would you want to see some of the documentation after that? |
| A. | Well, that -- no. I wouldn't have known -- I wouldn't know right now whether or not that was a change or whether that was just an affirmation of what we had agreed upon. |
| Q. | That's because you don't remember? |
| A. | That's right. |

(Doc. 79, Ex. AA.)

the validity of the write-down form, and subsequently, as to whether Pocono Mountain was provided with a section 1734 request.  As such, the UIM coverage limits under the policy cannot be determined by the Court at this time.  Therefore, both Plaintiff's and Defendants' motions for summary judgment will be denied with respect to this claim.

**3.    Bad Faith in Investigative Practices**

In Pennsylvania, an action alleging bad faith conduct by an insurance carrier is brought pursuant to Pennsylvania's Bad Faith Insurance Statute, 42 PA. CONS. STAT. § 8371.[2]  There is no legislative history and no statutory definition of bad faith.  In the absence of any legislative guidance, Pennsylvania courts have adopted the following definition of bad faith:

> "Bad Faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent.  For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or

---

[2]  The statute provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

42 PA. CONS. STAT. § 8371 (2005).

16

bad judgment is not bad faith.

*O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 905 (Pa. Super. Ct. 1999) (citing *Romano v. Nationwide Mut. Fire Ins. Co.*, 646 A.2d 1228, 1232 (Pa. Super. Ct. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)).

Generally, to make out a bad faith claim a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of reasonable basis in denying the claim." *W.D. Realty, Inc. v. Northern Ins. Co.*, 334 F.3d 306, 312 (3d Cir. 2003); *Hayes v. Harleysville Mutual Insurance Co.*, 841 A.2d 121,125 (Pa. Super. Ct. 2003). It is now clear, however, that section 8371 is not restricted to an insurer's bad faith in denying a claim. An action for bad faith may also extend to the insurer's investigative practices. *O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. Ct. 1999).

When considering the merits of a bad faith, "one must look at the behavior of the insurer toward the insured and measure its reasonableness." *Nelson v. State Farm Mut. Auto. Ins. Co.*, 988 F. Supp. 527, 532 (E.D. Pa. 1997); *Ash v. Continental Ins. Co.*, 861 A.2d 979, 983-84 (Pa. Super. Ct. 2004). Further, because of the heightened clear and convincing standard, this Court must "examine the evidence to ascertain whether it is so 'clear, direct, weighty and convincing' so as to enable the court to make its decision with 'a clear conviction.'" *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 752 (3d Cir. 1994) (citing *United States Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d Cir.1985) (quoting *In re Estate of Fickert*, 337 A.2d 592, 594 (1975)).

17

Plaintiff asserts that Defendants have acted with bad faith by intentionally delaying the resolution of her UIM claim.  Namely, Plaintiff argues that Defendants have misrepresented the existence of an applicable write-down form, and have failed to timely identify and produce the requested write-down form in an attempt to stonewall the proceedings.  Plaintiff points to the evidence she submitted demonstrating the numerous times she requested the write-down form (Doc. 87 ¶¶ 11, 23; Doc. 87, Ex. A, at ¶¶ 12, 14, 15, 19; Doc. 79, Ex. X), evidence that the first time the write-down form was requested from Defendants' archives was on December 31, 2001 (Doc. 89, deposition of Joanne Garland, at 28-30), Ms. Garland's log on November 28, 2001, stating that Defendants should "put the 'brakes' on the arbitration" (Doc. 87 ¶ 32), and Mr. Florian's testimony that "to retrieve a file from archives it would be days, within a couple of days" (Doc. 88 at 67).

Defendants submitted evidence that they failed to produce the applicable write-down form only because part of their file was missing.  (Doc. 88 at 68-67, 82-83.) Further, Defendants submitted evidence that as soon as they received a copy of the applicable write-down form they forwarded a copy to Plaintiff's counsel.  (Doc. 79, Ex. Z.) Moreover, Defendants argue, that throughout the search for the write-down form they took a reasonable and accurate legal position that the UIM benefits under the policy were limited to thirty-five thousand dollars ($35,000).  Lastly, Defendants submitted evidence that they have extended an offer to Plaintiff for thirty-five thousand dollars ($35,000), the amount they believe is the policy limits.  (Doc. 79, Ex. Y.)

Considering the evidence submitted, Plaintiff has failed to establish by clear and convincing evidence that Defendants' investigative practices, with regard to Plaintiff's claim, constituted bad faith.  Plaintiff has not demonstrated that Defendants' actions were

18

so unreasonable as to allow the Court to determine with a clear conviction that they acted in bad faith.  Therefore, Plaintiff's motion for summary judgment will be denied with respect to this claim.   Plaintiff may, however, be able to meet her heightened burden of proof, and establish that Defendants acted in bad faith.  Namely, if Plaintiff is able to demonstrate that the applicable write-down form produced by Defendants is invalid, Plaintiff may be able to prove bad faith on the part of Defendants.  Therefore, Defendants' motion for summary judgment will also be denied with respect to this claim.

**4.     Breach of Contract**

Defendants also seek summary judgment as to Plaintiff's claim for breach of contract.  Defendants argue that Plaintiff has failed to present any evidence to suggest that Defendants breached their insurance contract with Plaintiff.  Furthermore, Defendants argue that: (1) all the evidence shows that Defendants acted in accordance with the insurance contract by conducting a reasonable investigation and tendering an offer for the policy limits of thirty-five thousand dollars ($35,000); and (2) Plaintiff has failed to present evidence of any damage she suffered as a result of the alleged breach. I disagree.

As discussed previously, Plaintiff has submitted evidence, that when taken as a whole, raises a genuine issue of material fact as to the validity of the write-down form produced by Defendants.  As such, the UIM coverage limits under the policy cannot be determined by the Court at this time.  In addition, if Plaintiff is able to demonstrate that the applicable write-down form is not valid, Plaintiff might prove bad faith on the part of Defendants. Further, Plaintiff has demonstrated potential damages, as she has yet to receive any benefits under the policy.  Therefore, Defendants' motion will be denied with

19

respect to Plaintiff's breach of contract claim.

**5.    Civil Conspiracy**

Lastly, Defendants' seek summary judgment as to Plaintiff's claim of civil

conspiracy.  In order to state a cause of action for civil conspiracy under Pennsylvania

law, Plaintiff must allege: "(1) a combination of two or more persons acting with a

common purpose to do an unlawful act or to do a lawful act by unlawful means or for an

unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3)

actual legal damage."  *Kline v. Sec. Guards, Inc.*, 386 F.3d 246, 262 (3d Cir. 2004)

(quoting *McGuire v. Shubert*, 722 A.2d 1087, 1092 (Pa. Super. Ct. 1998)).  A single entity

cannot conspire with itself and, similarly, agents of a single entity cannot conspire with

themselves.  *Rutherfoord v. Presbyterian-University Hosp.*, 612 A.2d 500, 508 (Pa.

Super. Ct. 1992).

In the present case, Defendants submitted evidence that American is a wholly

owned subsidiary of Fireman's.  (Doc. 79, Ex. E ¶ 4.)  Further, Defendants submitted

evidence that American had no employees during the relevant time period.  *Id.* at ¶ 5.

Moreover, according to evidence submitted by Defendants, American underwrites

insurance policies only for Fireman's insureds, and Fireman's employees act solely on

behalf of Fireman's and its affiliates.  *Id.* at ¶ 8.   Therefore, American and Fireman's, as

well as Fireman's employees, are too connected to be deemed to have conspired with

each other.  As such, Defendants' motion will be granted with respect to this claim.

### CONCLUSION

Given the occurrence of intervening events, the substantial nature of the evidence,

and the importance to both parties of whether a write-down form exists, the alleged stipulation by Defendants on June 28, 2002, will be set aside to avoid a manifest injustice.  As such, Plaintiff's summary judgment motion will be denied with respect to this claim.  Furthermore, given the evidence before the Court, there is a genuine issue of material fact as to the validity of the applicable write-down form.  As such, it is not clear whether Pocono Mountain was provided with a section 1734 request, and, therefore, the UIM coverage limits under the policy cannot be determined by the Court at this time. Both Plaintiff's and Defendants' motions for summary judgment will be denied with respect to this claim.  In addition, considering the evidence submitted, Plaintiff has failed to establish by clear and convincing evidence that Defendants' investigative practices constituted bad faith.  However, Plaintiff may later be able to present evidence that the applicable write-down form provided by Defendants is invalid and, thus, be able to demonstrate bad faith on the part of Defendants.  Therefore, both Plaintiff's and Defendants' motions for summary judgment will be denied with respect to this claim.

Next, Defendants' motion for summary judgment as to Plaintiff's breach of contract claim will be denied.  Plaintiff has submitted evidence, discussed previously, that is sufficient to sustain this claim.  Finally, Fireman's and American, which has no employees and is a wholly owned subsidiary of Fireman's, are too intertwined to be deemed to have conspired with each other.  As such, Defendants' motion will be granted with respect to Plaintiff's claim of civil conspiracy.

An appropriate Order will follow.


 January 20, 2006              /s/ A. Richard Caputo
Date                        A. Richard Caputo
                            United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JULIE SAWYER,

     Plaintiff

        v.

FIREMAN'S FUND INSURANCE
COMPANY, and AMERICAN AUTO
INSURANCE COMPANY,

     Defendants.

NO. 3:03-CV-0233

(JUDGE CAPUTO)

## ORDER

**NOW**, this   20th   day of January, 2006, **IT IS HEREBY ORDERED** that:

A.    Defendants' Motion for Summary Judgment (Doc. 79) is **GRANTED in part** and **DENIED in part**:

    1.    Defendants' motion is **GRANTED** insofar as it seeks summary judgment with respect to:

        (a)    Plaintiff's claim for Civil Conspiracy

    2.    Defendants' motion is **DENIED** in all other respects.

B.    Plaintiff's Motion for Summary Judgment (Doc. 85) is **DENIED**.

        /s/ A. Richard Caputo
        A. Richard Caputo
        United States District Judge